AES:DG/MEB
F. #2018R00984

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

IVARS AUZINS,
  also known as "Aivars Grauzdins,"

  Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

I N D I C T M E N T

1:21-cr-00357(ERK)(TAM)
Cr. No. _____
(T. 15, U.S.C., §§ 78j(b) and 78ff; T. 18,
U.S.C., §§ 371, 981(a)(1)(C), 1343,
1349, 2 and 3551 et seq.; T. 21, U.S.C.,
§ 853(p); T. 28, U.S.C., § 2461(c))

THE GRAND JURY CHARGES:

INTRODUCTION

At all times relevant to this Indictment, unless otherwise indicated:

I. The Defendant and Relevant Individuals and Entities

1. The defendant IVARS AUZINS, also known as "Aivars Grauzdins," was a Latvian national who resided in Riga, Latvia. AUZINS used aliases to conceal his identity and to secretly operate a number of entities, including all of the entities listed in Sections IA, IB and IC below, which purported to offer, invest in or mine digital assets.

2. Co-Conspirator 1, an individual whose identity is known to the Grand Jury, was a Latvian national and resident of Latvia. Co-Conspirator 1 worked with the defendant IVARS AUZINS to create and operate websites for entities that purported to offer, invest in or mine digital assets.

A. <u>Entities that Raised Funds through Initial Coin Offerings</u>

3. Bitroad Limited ("Bitroad") was an entity that purported to offer a digital asset, specifically a digital coin called "BTD Coin." In or about and between November 2017 and December 2017, on its website and various social media outlets, Bitroad solicited investors to purchase its digital coin during a pre-Initial Coin Offering ("ICO") sale and during an ICO. Bitroad's website claimed that BTD Coin gave "users access to a simpler, safer and faster transaction method" that was "like Bitcoin yet unlike Bitcoin." Bitroad also purported to offer digital wallets to store cryptocurrency and a debit card that could be used "anytime all over the world." Bitroad's website featured a whitepaper that purported to explain Bitroad's business model.

4. Denaro was an entity that purported on its website to provide a "multi-currency debit card platform that enables users to access, store, and spend their cryptocurrencies like any other debit card." Denaro purported to be affiliated with a company incorporated in the United Kingdom called Cryptoshine Limited. In or about and between January 2018 and March 2018, on its website and various social media outlets, Denaro solicited investors to purchase its digital coin, called "DNO Token," during a pre-ICO sale and during an ICO. Denaro's website featured a whitepaper that purported to explain Denaro's business model and had biographical information and photographs of its purported executive team. In or about March 2018, Denaro's website claimed that the Denaro ICO had raised more than $11 million.

B. <u>Entities that Raised Funds for Investment Platforms</u>

5. Impressio Estate Ltd. ("Impressio") was an entity that purported on its website to be a "UK-based cryptocurrency investment platform for users worldwide to invest and grow their money, whether it is deposited all at once or incrementally." Impressio solicited

investors in or about early 2018. The Impressio website claimed to offer different investment plans, referred to as "starter," "advanced" and "pro."

6. Broi Investments Ltd., also known as Bankroi ("Bankroi"), was an entity that purported on its website to be a "UK-based cryptocurrency investment platform for users worldwide to invest and grow their money, whether it is deposited all at once or incrementally." Bankroi solicited investors in or about mid-2018. The Bankroi website claimed to offer different investment plans, referred to as "starter," "advanced," "pro" and "platinum."

7. ChangePro Pty Ltd. ("ChangePro") was an entity that purported on its website to be an "investment and exchange company based in Australia." ChangePro solicited investors in or about late-2018. ChangePro's website offered "just one straightforward investment plan which pays investors anywhere from 7% to 10% on a daily basis on a calendar day cycle." ChangePro's website displayed a "profit calculator" for the investment plans purporting to show "daily forever" profits of 7 percent, 8 percent or 10 percent.

8. Gemneon Investments Limited ("Gemneon") was an entity that purported on its website to be a "company which specializes in cryptocurrency trading and investment." Gemneon purported to be affiliated with a company registered in Hong Kong called Gem Investments Limited. Gemneon solicited investors in or about and between late 2018 and early 2019. Gemneon's website displayed a "profit calculator" for its investment plans purporting to show "daily forever" profits of 6 percent, 8 percent or 9 percent.

9. Lycovest Ltd. ("Lycovest") was an entity that purported on its website to be a "U.K.-based cryptocurrency investment platform for users across the world who want to invest and grow their money, whether it is deposited all at once or incrementally." Lycovest

solicited investors in or about and between early and mid-2019. Lycovest's website purported to show "daily forever" profits for its investment plans of 10 percent, 12 percent or 15 percent.

        C.     Entity that Raised Funds for Mining Operations

        10.     Innovamine was an entity that purported to run a cryptocurrency mining operation. Innovamine purported to be affiliated with a company registered in Australia called Innovatrade Pty Ltd. Innovamine solicited investors in or about and between early and mid-2019. Innovamine's website purported to offer investments in mining a number of cryptocurrencies, including Bitcoin and Ether.

II.     Relevant Definitions

        11.     A "digital asset" referred to an asset that was issued and transferred using distributed ledger or blockchain technology, including, but not limited to, so-called "digital currencies," "virtual currencies," "digital coins" and "tokens." Examples of digital assets included Bitcoin and Ether.

        12.     A "blockchain" was a type of distributed ledger, or peer-to-peer database spread across a network, that recorded all transactions in the network in theoretically unchangeable, digitally recorded data packages called blocks. Each block contained a batch of records of transactions, including a timestamp and reference to the previous block, linking the blocks together in a chain. The system relied on cryptographic techniques for secure recording of transactions.

        13.     An "Initial Coin Offering" or "ICO" was a fundraising event during which an entity offered participants a unique "coin" or "token" in exchange for consideration. The tokens or coins were generally issued on a blockchain or a cryptographically secured ledger and were often paid for with digital assets. ICOs were typically announced and promoted through

the Internet and email. Issuers typically released a "whitepaper" describing the project and the terms of the ICO. To participate in the ICO, investors generally were required to transfer funds to the issuer. After the completion of the ICO, the issuer would distribute its unique coin or token to the participants. The tokens might entitle holders to certain rights related to a venture underlying the ICO, such as rights to profits, shares of assets, rights to use certain services provided by the issuer and/or voting rights. Such tokens also might be listed on online platforms, often called digital asset exchanges, and might be tradable for virtual currencies.

14. "Cryptocurrency mining" was a revenue-generating process wherein a person or entity used a computer to run special software to solve complex algorithms used to validate transactions in a cryptocurrency network. For example, in the case of Bitcoin mining, the network collected all transactions made during a set time period into a list called a block. Miners competed to be the first to confirm the transactions in the block and write that block to the Bitcoin blockchain. The first miner to confirm a block of transactions and write the block to the blockchain was rewarded with newly issued or "mined" Bitcoin. These Bitcoins, in turn, could be held or sold on a cryptocurrency exchange for fiat currency, such as U.S. dollars.

15. A "cryptocurrency investment platform" was an investment platform that solicited investors to transfer funds and digital assets to the platform so that assets would be invested by the platform to earn profits for the investors.

16. An "exit scam" with respect to digital assets was a type of fraud where a fraudster or a group of fraudsters raised money, often through an ICO, and then stole the money and disappeared. The fraudsters typically used a website that purported to launch a promising concept. The website often included a fictitious whitepaper describing a concept and fictitious information regarding the founders of the purported venture. After raising money from

investors, the website disappeared, the fraudsters stopped responding to communications from investors and the investors lost their money.

17. An "investment contract" was an investment of money in a common enterprise with a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others. An investment contract was a security as defined by Section 2(a)(1) of the Securities Act of 1933 ("Securities Act") and Section 3(a)(10) of the Securities Exchange Act of 1934 ("Exchange Act"). Investments in Bitroad, Denaro, Impressio, Bankroi, ChangePro, Gemneon, Lycovest and Innovamine were investment contracts, and therefore "securities" as defined by Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act.

III. The Fraudulent Scheme

18. In or about and between November 2017 and July 2019, the defendant IVARS AUZINS, together with others, engaged in a scheme to defraud investors and potential investors in entities including Bitroad, Denaro, Impressio, Bankroi, ChangePro, Gemneon, Lycovest and Innovamine (the "Auzins Entities") by inducing them to invest in the Auzins Entities through material misrepresentations and omissions about, among other things, the products and services that the Auzins Entities claimed to provide; the profits that investors would earn by investing in the Auzins Entities; and the individuals who operated the Auzins Entities.

19. Each of the Auzins Entities were exit scams that operated in a similar way: they advertised through email campaigns, social media and websites dedicated to cryptocurrencies; purported to offer valuable investment opportunities; solicited investments; and then effectively disappeared.

20. For example, in its whitepaper and marketing materials, Denaro stated, among other things, that (i) its Chief Executive Officer, "Ron Ramsey," previously was an executive at a technology company based in Ohio (the "Technology Company"), the identity of which is known to the Grand Jury; (ii) its Chief Financial Officer, "Jeremy Boker," obtained a degree from a university in Kentucky (the "University"), the identity of which is known to the Grand Jury; and (iii) its debit cards were associated with a credit card company based in New York (the "Credit Card Company"), the identity of which is known to the Grand Jury. These representations were false: the Technology Company did not employ an individual named "Ron Ramsey," the University did not have a student named "Jeremy Boker" and the Credit Card Company did not have a relationship with Denaro. After soliciting investors in its ICO through, among other things, emails purportedly sent from "Ron Ramsey," Denaro stopped its public advertising campaign, its website became publicly inaccessible and its investors lost their investments.

21. Similarly, on its website and in marketing materials, Innovamine stated, among other things, that it (i) offered two-year mining contracts for multiple cryptocurrencies, including Bitcoin, Etherum and Litecoin; (ii) established a new mining facility with "state-of-the-art mining gears, power generators and top skilled staff"; and (iii) offered a debit card that was associated with the Credit Card Company. In fact, shortly after making these representations, Innovamine – which, like Denaro, did not have a relationship with the Credit Card Company – stopped its advertising campaign and its website became publicly inaccessible. Innovamine's investors, who had been able to make withdrawals while the Innovamine website was operative, lost their investments.

22. In or about and between November 2017 and July 2019, individuals physically present in the United States, including individuals who made investments in Denaro and Innovamine, and individuals elsewhere, sent at least $7 million in digital assets to the Auzins Entities. Shortly after receiving these investments, the defendant IVARS AUZINS, together with others, stole the investors' funds and the Auzins Entities disappeared without providing the promised services.

23. Although not mentioned on the Auzins Entities' websites or in their investment materials, the defendant IVARS AUZINS operated the Auzins Entities. Among other things, AUZINS, using aliases, formed corporate entities in multiple countries that were purportedly affiliated with the Auzins Entities and registered domains for the Auzins Entities' websites. In addition, AUZINS maintained a cloud storage account that included numerous photographs associated with the Auzins Entities. For example, AUZINS had photographs of electronic devices that showed, among other things, separate electronic folders for Bitroad, Denaro and Changepro; email accounts associated with Innovamine and Gemneon; and a webpage showing the "admin control panel" for Innovamine.

COUNT ONE
(Conspiracy to Commit Wire Fraud)

24. The allegations contained in paragraphs one through 23 are realleged and incorporated as if fully set forth in this paragraph.

25. In or about and between November 2017 and July 2019, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant IVARS AUZINS, also known as "Aivars Grauzdins," together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud investors and potential investors in the Auzins Entities, and to obtain money and property from them by means of one or more

materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce writings, signs, signals, pictures and sounds, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

## COUNTS TWO AND THREE
(Wire Fraud)

26. The allegations contained in paragraphs one through 23 are realleged and incorporated as if fully set forth in this paragraph.

27. In or about and between November 2017 and July 2019, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant IVARS AUZINS, also known as "Aivars Grauzdins," together with others, did knowingly and intentionally devise a scheme and artifice to defraud investors and potential investors in the Auzins Entities, and to obtain money and property from them by means of one or more materially false and fraudulent pretenses, representations and promises.

28. On or about the dates set forth below, for the purpose of executing such scheme and artifice, the defendant IVARS AUZINS, also known as "Aivars Grauzdins," together with others, did transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce foreign commerce writings, signs, signals, pictures and sounds, as set forth below:

| COUNT | APPROXIMATE WIRE DATE | DESCRIPTION |
|---|---|---|
| TWO | February 5, 2019 | Email from a Gemneon email account to an undercover agent (the "Agent"), who was located in Brooklyn, New York, confirming an investment in Gemneon. |

| THREE | June 28, 2019 | Email from an Innovamine email account to the Agent, who was located in Brooklyn, New York, confirming an investment in Innovamine. |

(Title 18, United States Code, Sections 1343, 2 and 3551 et seq.)

## COUNT FOUR
(Conspiracy to Commit Securities Fraud)

29. The allegations contained in paragraphs one through 23 are realleged and incorporated as if fully set forth in this paragraph.

30. In or about and between November 2017 and July 2019, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant IVARS AUZINS, also known as "Aivars Grauzdins," together with others, did knowingly and willfully conspire to use and employ one or more manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and Regulations of the U.S. Securities and Exchange Commission, Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing one or more devices, schemes and artifices to defraud; (b) making one or more untrue statements of material fact and omitting to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in one or more acts, practices and courses of business which would and did operate as a fraud and deceit upon one or more investors and potential investors in the Auzins Entities in connection with the purchase and sale of investments in the Auzins Entities, directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails, contrary to Title 15, United States Code, Sections 78j(b) and 78ff.

31. In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendant IVARS AUZINS, also known as

"Aivars Grauzdins," together with others, committed and caused the commission of, among others, the following:

### OVERT ACTS

(a)     On or about February 3, 2018, AUZINS sent Co-Conspirator 1 a text message regarding logging into a Denaro account.

(b)     On or about February 23, 2018, a Denaro email account sent Individual 1, a resident of Brooklyn, New York whose identity is known to the Grand Jury, an email confirming that Individual 1 had created a Denaro account.

(c)     On or about March 1, 2018, a Denaro email account sent an email to investors and potential investors soliciting investments in Denaro. The email offered a bonus to the first group of investors and stated that "USA Citizens are allowed to participate."

(d)     On or about March 6, 2018, a Denaro email account sent an email to investors and potential investors, including Individual 1, soliciting investments in Denaro and providing a "coupon code" for investors to obtain a purported discount.

(e)     On or about October 5, 2018, a Bankroi email account sent Co-Conspirator 1 an email, the subject of which was "Bankroi Account Confirmation." The name associated with the Bankroi email account was "ChangePro," and the content of the email referenced both Bankroi and ChangePro.

(f)     On or about March 16, 2018, a Denaro email account sent an email to investors and potential investors stating that the Denaro ICO had successfully ended.

(g)     On or about October 5, 2018 a ChangePro email account sent Co-Conspirator 1 an email. The content of the email was "test."

(h)     On or about October 26, 2018, a ChangePro email account sent Denaro Victim 1, a resident of Florida who invested in Denaro and whose identity is known to the Grand Jury, an email purporting to provide a link to confirm registration with ChangePro.

(i)     On or about February 5, 2019, Gemneon purported to sell the Agent, who was located in Brooklyn, New York, an investment in an investment plan offered on Gemneon's website.

(j)     On or about February 5, 2019, a Gemneon email account sent the Agent, who was located in Brooklyn, New York, an email confirming an investment in Gemneon.

(k)     On or about June 28, 2019, Innovamine purported to sell the Agent, who was located in Brooklyn, New York, an investment in Bitcoin mining offered on Innovamine's website.

(l)     On or about June 28, 2019, an Innovamine email account sent the Agent, who was located in Brooklyn, New York, an email confirming an investment in Innovamine.

(m)     On or about July 2, 2019, an Innovamine email account sent an email to investors and potential investors soliciting investments. The email stated that Innovamine was offering mining contracts for a number of cryptocurrencies, including Bitcoin, Ethereum and Litecoin.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

## COUNT FIVE
(Securities Fraud - Denaro)

32.     The allegations contained in paragraphs one through 23 are realleged and incorporated as if fully set forth in this paragraph.

33. In or about and between January 2018 and March 2018, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant IVARS AUZINS, also known as "Aivars Grauzdins," together with others, did knowingly and willfully use and employ one or more manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission, Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing one or more devices, schemes and artifices to defraud; (b) making one or more untrue statements of material fact and omitting to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in one or more acts, practices and courses of business which would and did operate as a fraud and deceit upon one or more investors and potential investors in Denaro in connection with the purchase and sale of investments in Denaro, directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails, contrary to Title 15, United States Code, Sections 78j(b) and 78ff.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 18, United States Code, Sections 2 and 3551 et seq.)

## COUNT SIX
(Securities Fraud - Innovamine)

34. The allegations contained in paragraphs one through 23 are realleged and incorporated as if fully set forth in this paragraph.

35. In or about and between March 2019 and July 2019, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant IVARS AUZINS, also known as "Aivars Grauzdins," together with others, did knowingly and willfully use and employ one or more manipulative and deceptive devices and contrivances,

contrary to Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission, Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing one or more devices, schemes and artifices to defraud; (b) making one or more untrue statements of material fact and omitting to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in one or more acts, practices and courses of business which would and did operate as a fraud and deceit upon one or more investors and potential investors in Innovamine in connection with the purchase and sale of investments in Innovamine, directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails, contrary to Title 15, United States Code, Sections 78j(b) and 78ff.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 18, United States Code, Sections 2 and 3551 et seq.)

## CRIMINAL FORFEITURE ALLEGATION

36. The United States hereby gives notice to the defendant that, upon his conviction of any of the offenses charged herein, the United States will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offenses to forfeit any property, real or personal, constituting or derived from proceeds obtained directly or indirectly as a result of such offenses.

37. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

      (a)    cannot be located upon the exercise of due diligence;

      (b)    has been transferred or sold to, or deposited with, a third party;

      (c)    has been placed beyond the jurisdiction of the court;

      (d)    has been substantially diminished in value; or

      (e)    has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code, Section 853(p); Title 28, United States Code, Section 2461(c))

A TRUE BILL

_____
FOREPERSON

_____
JACQUELYN M. KASULIS
ACTING UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

F. # 2018R00984
FORM DBD-34
JUN. 85

No. _____

**UNITED STATES DISTRICT COURT**
EASTERN *District of* NEW YORK
CRIMINAL DIVISION

THE UNITED STATES OF AMERICA

vs.

*IVARS AUZINS,*
*also known as "Aivars Grauzdins,"*

Defendant.

**INDICTMENT**

( T. 15, U.S.C., §§ 78j(b) and 78ff; T. 18, U.S.C., §§ 2, 371, 981(a)(1)(C), 1343, 1349 and 3551 et seq.; T. 21, U.S.C., § 853(p); T. 28, U.S.C., § 2461(c))

*A true bill.*

_____
*Foreperson*

*Filed in open court this* _____ *day,*

*of* _____ *A.D. 20* _____

_____
*Clerk*

Bail, $ _____

_____
*David Gopstein and Mark E. Bini, Assistant U.S. Attorneys (718) 254-7000*